Elizabeth Monroe **KIRBY**, Appellant,

v.

Alberta McKain **BROWN** and Amanda
McKain Reaves, Appellees.

No. 5669.

Court of Civil Appeals of Texas.
El Paso.

Sept. 9, 1964.

Rehearing Denied Oct. 28, 1964.

Brewster & Hoy, El Paso, for appellant.
Pearson & Speer, El Paso, for appellees.

CLAYTON, Justice.

This is a will contest. The decedent,
Jeannette McKain Monroe, died on March

12, 1962. Shortly thereafter Elizabeth Monroe Kirby, a foster-daughter, filed application for the probate of a purported will of decedent dated August 10, 1960, which left all the property of decedent, including Government bonds, to the applicant and named her Independent Executrix of the estate. The applicant is herein designated as the Proponent of said will and appellant here. A contest of said purported will was filed by Mrs. Alberta McKain Brown and Mrs. Amanda McKain Reaves, sisters of decedent, herein designated appellees and Contestants, who claimed lack of testamentary capacity of, and undue influence exerted upon, the decedent at the time of the execution of this will and asked for the probate of a prior will dated March 24, 1958. The prior will provided for an essentially equal distribution of the estate between the foster-daughter and the two sisters, with all Government bonds to go to the person named in each bond as payee upon death of the testatrix. In the County Court at Law of El Paso County, Texas, where the contest was heard, judgment was entered for Proponent and the 1960 will was admitted to probate. Appeal was taken to the District Court of El Paso County, where trial was to a jury. Undue influence was not raised by the evidence, and in answer to a single issue the jury found that the testatrix, at the time she executed the 1960 will, lacked testamentary capacity. Judgment was then entered for Contestants of this will and the 1958 will was admitted to probate; from which judgment Proponent brought this appeal. Before judgment was entered it was conceded that the earlier will was entitled to be probated in the event that the later will was not established as the valid will of the decedent.

Appellant presents six points of error. The first point urges error on the part of the court in overruling Proponent's motion for an instructed verdict at the close of Contestants' case. Appellant's position is that as Proponent of the 1960 will she had established a prima facie case for admission to probate of said will, and that Con-testants had failed to meet their burden of proof or to rebut Proponent's case, and that there was no evidence, or insufficient evidence, to show the lack of testamentary capacity on the part of the testatrix, and therefore no issue of fact was presented for submission to the jury.

The second point cites error in overruling Proponent's motion for an instructed verdict at the close of all the evidence because of the absence of any evidence of probative force, or sufficient evidence, to show lack of testamentary capacity, whereas Proponent had established by the undisputed evidence, and by the great weight and preponderance of the evidence, that the 1960 will was entitled to probate.

The third point complains of the overruling of Proponent's objection to the submission of the sole issue of testamentary capacity to the jury, and the fourth point relates to the overruling of Proponent's Motion for Judgment Non Obstante Veredicto.

All of these points are "no evidence" points; 38 Texas Law Review 361, " 'No Evidence' and 'Insufficient Evidence' Points of Error" (1960), Robert W. Calvert, at page 362. See also Great Atlantic & Pacific Tea Company v. Giles, 354 S.W.2d 410 (Tex.Civ.App., 1962; Ref., N.R.E.):

"At the outset appellees object to our consideration of appellant's 'insufficient evidence' points, contending that a motion for instructed verdict and a motion for judgment notwithstanding the verdict do not raise questions of sufficiency or weight of the evidence but only raise questions of 'no evidence'. We agree that this is the law. 4 Tex. Jur.2d § 769, p. 279; In re King's Estate, 150 Tex. 662, 244 S.W.2d 660; Galveston, H. & S. A. Ry. Co. v. Cook ([Tex.]Civ.App.), 214 S.W. 539. Accordingly, we will consider all of appellant's points as 'no evidence' points. Glens Falls Insurance Company v. Vetrano, Tex.Civ.App., 347 S.W.2d

769; Shapiro v. Edwards; Tex.Civ. App., 331 S.W.2d 242.

"In passing upon 'no evidence' points we must be governed by the well-established rule that if an issue of fact is raised by the evidence, it must go to the jury even though a verdict based on such evidence would have to be set aside as not supported by sufficient evidence. Wallace v. Southern Cotton-Oil Co., 91 Tex. 18, 40 S.W. 399. An issue of fact is raised if discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff." (Citing cases).

■ The fifth point of error is based upon the overruling of Proponent's Amended Motion for New Trial assigning therefor that the verdict of the jury was not supported by the evidence and was so contrary to the great weight and preponderance of the evidence as to be wrong and unjust. This is an "insufficient evidence" point. 38 Texas Law Review, supra, at page 365.

These points require a careful examination of the entire evidence and a brief statement thereof to explain our determination of these points.

The testatrix suffered a stroke on May 6, 1960 and was confined to a hospital. On May 9th an application was filed in probate court for the appointment of Proponent as Temporary Guardian of testatrix' estate, the heading of the application reading "In the Guardianship of Jeannette Monroe, an Incompetent". The application was filed under the provisions of the Texas Probate Code, V.A.T.S., which, in Part 1 of Chapter VI provides for "Temporary Administration in the Interest of (A) Estates of Decedents, and (B) Persons or Estates of Minors and Incompetents". The word "Incompetent" also appears in the heading of

various other instruments filed in connection with the guardianship, both before and after the will of August 10, 1960 was executed by testatrix. Proponent, on May 10, 1960, and in connection with her appointment as Temporary Guardian, signed a $10,000.00 bond describing her ward as "Jeannette Monroe, an Incompetent, and a person of unsound mind"; and an oath reciting the ward was "a person of unsound mind". The Texas Probate Code, Chapter 1, section 3 (p), provides that " 'Incompetents' or 'Incompetent persons' are persons non compos mentis, idiots, lunatics, insane persons, common or habitual drunkards, and other persons who are *mentally* incompetent to care for themselves or to manage their property and financial affairs." Section 3(y) provides: " 'Persons of unsound mind' are persons non compos mentis, idiots, lunatics, insane persons, and other persons who are *mentally* incompetent to care for themselves or to manage their property and financial affairs." (Emphasis supplied).

On August 12, 1960, two days after the execution of the proffered August 10th will (which allegedly was signed for testatrix by an attorney), Proponent filed her application for appointment as Permanent Guardian of the estate of Jeannette Monroe. In this application no mention is made of an "incompetent", but in other papers filed in connection therewith the word "incompetent" is used. Furthermore, Section 114 of Chapter V of the Probate Code, relative to the appointment of a guardian, reads as follows: "114. *Facts Which Must Be Proved.* Before appointing a guardian, the court must find: (a) That the person for whom a guardian is to be appointed is either a minor, a person of unsound mind, an habitual drunkard, or a person for whom it is necessary to have a guardian appointed to receive funds due such person from any governmental source. * * *"

It must be presumed that the court found, on August 29, 1960, when it ordered the appointment of Proponent as guardian, that the law had been given compliance and the

only appropriate requisite—that the ward was of unsound mind—had been proved. And we feel this must be so notwithstanding the recital in the exhibit and accounting signed by Proponent on September 3, 1960 that "The ward, Jeannette Monroe, remains a bed-ridden invalid and completely paralyzed. Her mind, however, remains very keen so that as a practical matter she, the said Jeannette Monroe, directs the actions of this representative". On September 27, 1960, in the heading of another instrument filed in the cause and signed by the guardian, the ward was still being described as "an incompetent".

On October 2, 1961 the Proponent signed and swore to a petition for her discharge as guardian and for the close of the guardianship in which she prayed "that upon final hearing hereof the said Jeannette Monroe be held by the Court to be of sound mind * * *." Pursuant to this petition, on October 16, 1961 the court entered its order reading in part as follows: "* * * and it further appearing to the court * * * from the allegations of the applicant and from the evidence that said ward is of sound mind is not doubtful, and that she is now a person of sound mind * * * it is accordingly ordered, adjudged and decreed that the said ward has been and is now restored to her right mind and is now a person of sound mind * * * she is hereby, discharged from guardianship * * *."

The applicant also alleged that the ward had "recovered her strength and ability of movement to such a degree that she is now able to handle, manage and protect her own estate * * *", but there was no finding to this effect, and on the same date as the order closing the guardianship, the ward, by her "X" mark, executed a "full, unlimited and universal power of attorney" to the applicant covering all of the ward's property and estate, although the ward, as testatrix in the 1958 will, had signed her full name thereto.

The foregoing has been set out in perhaps greater than necessary detail, but is intended to be illustrative, but definitely not all-inclusive, of the documentary evidence presented by Contestants to the jury. There is certain testimony presented in the record which should be mentioned. Part of the testimony of Mr. Morris Raney, attorney for the decedent and also in the probate proceedings described as attorney for the guardian (Proponent), is illuminating. On direct examination by counsel for Proponent, Mr. Raney testified:

"Q  All right. As a result of your numerous conversations, that you testified to, in regard to making the Will and buying and selling the property and so forth, do you know what Mrs. Monroe's opinion of, or what she thought of the Proponent in this Will Contest and the two Contestants in this Will Contest?

"A  Well, Mrs. Monroe was very fond —Now you are speaking of Mrs. Kirby as the Proponent?

"Q  As the Proponent—

"A  And I believe it is Mrs. Brown and Mrs. Reeves, isn't it?

"Q  As the Contestants, yes.

"A  As the Contestants. Well, she was very fond of all three of them. She would, as I say, Mrs. Monroe was a very strong-will person, and on some occasions she would become offended at Elizabeth and she would comment that she ought to change her Will, that she ought to just leave everything to her Church and leave, leave Elizabeth's part to the Church. Then on other occasions she had made the same comment in connection with her sisters, both of them. She has become, at times I have heard her make remarks about being offended at Mrs. Kirby's husband and she thought maybe she ought to change her Will. Well,

when these kind of things occurred I always recommended to Mrs. Monroe that she deliberate on this a little bit and see if possibly she shouldn't leave her Will like it is. And ordinarily that is what happened. She did. And where these changes were, these Wills that I am speaking of up through the 1958 Will were all pretty general, the same type of Will. By that I mean that the properties were left by her—Well most of her properties were left in specific bequest and she left her Will—Her Will would provide that she leave some of her properties to Elizabeth and some to each of her sisters and then the rest and residue of her estate, I believe in most instances, as I recall, was left to the three of them to share and share a-like. Now I may be wrong there. She might have changed that residue portion of her estate later on. But she was very fond of all three of these persons with the exception of a periodic spell of anger which Mrs. Monroe was capable of forming to anyone * * *."

At another point in the testimony, Mr. Raney described the circumstances relating to the execution of the 1960 will by the testatrix. He had testified that on August 9, 1960 he had been called to come from his home in Van Horn, Texas to El Paso where the testatrix was still confined to the hospital as the result of her stroke in May, 1960. The testatrix was at that time paralyzed and apparently had great difficulty in speaking. Mr. Raney learned from her that she wanted to "change will". Having her entire file with him, he took out the 1958 will and "went down the line on that with her". He testified (emphasis supplied): "I went down the list to each piece of property and asked her if she wanted to change that property so that it would go to

Elizabeth [Proponent], and she would *indicate* 'yes' * * * She wanted all of the property to go to Elizabeth and wanted Elizabeth independent executrix of her estate. *She didn't tell me this. By questions she gave me affirmative and negative answers from which I determined what she wanted.*" Mr. Raney then re-drew the will in accordance with what he states were her indicated desires and the next day (August 10) returned to the hospital room and in the presence of Dr. William R. Gaddis, her attending physician (whom he had invited to serve as a witness), and perhaps Mrs. Antonia Sandoval, a special nurse (another witness), read the will to the testatrix, who at that time was some 76 years of age. He describes the occasion as follows:

"A * * * during the time I was reading the Will to Mrs. Monroe, I visited with her for a few minutes and kind of *got her to talking or to making her talk in a noise so that I could understand her* and to assure myself that she could understand me, and I read the Will to her, verbatim, and after each paragraph asked her if that is what she wanted to do, if that was her Last Will, and she *indicated* that it was after each occasion or upon each question that way. And then I told her, 'Now, Mrs. Monroe, you cannot sign your name. Do you want me to sign it for you?' She said, 'Yes.' So then the nurse and Dr. Gaddis and the Notary Public from downstairs came into the room. And I asked Mrs. Monroe if she wanted to execute, this was her Last Will and Testament, and she indicated that it was. This is before all of these people. And I asked her if she understood the contents of this instrument and it did what she wanted it to do and she said, 'Yes,' or *indicated in the affirmative*. And then I asked her

if she wanted me to execute the Will for her, to sign her name to that Will for her, to do the signing for her, and she said, 'Yes.' And I asked her if she wanted to execute this Will publicly and declare this Will as her Last Will and Testament before these witnesses and she *indicated she did*. And did she wish them to sign it as witnesses and she *indicated that she did*." (Emphasis supplied).

Dr. Gaddis, as a witness to the 1960 will, also testified on cross-examination that on August 10 the testatrix had difficulty talking:

"Q And on that day that this Will was signed not a word came forth from her mouth, is that right?

"A No, I don't believe that is correct.

"Q Did she talk—?

"A She stated words, 'yes' or 'no.'

"Q You are definite about that?

"A As definite as I can be at this time, two and a half years later."

He had previously testified:

"Q 'Then were there occasions when she would just mumble, that is not talk plain? A. That is right. Q. Now I believe you have stated to Mr. Hoy that on the date that this Will was signed that she nodded? A. That is true. Q. And that she did not speak forth, could that be true? A. I can't say definitely. She may have nodded and spoke both, but I do know that she just nodded her head, nodding it an ascenting manner. Q. Nodding her head, moving her head forward like she was talking in sense, is that correct? A. That is correct. Q. Did you hear her say anything

there that day? A. I can't recall that I did, sir.' "

However, in contradiction of this testimony regarding the vocal difficulties of the testatrix, Mrs. Sandoval, the other witness to the August 10, 1960 will, testified to the following having occurred on that date between her and the testatrix:

"Q Following the execution of the Will did you have any conversation with her when the two of you were then alone?

"A Yes, after Lawyer Raney had left and Dr. Gaddis and the other lady, I asked her, 'Did you know what happened?' She said, 'Yes'. I said, 'Do you want to talk about it?' She said, 'Yes.' I said, 'Go ahead.' She said, 'Well I just signed my Will to Elizabeth, my daughter.' And I asked her if that was the way you wanted and she said, 'Yes.' So I asked her again. I said, 'Are you sure?' She said, 'Yes. Why do you keep asking me so much?' I said, 'Well, I just wanted to be sure that you know what you are doing.' She said, 'Sure, I know what I am doing. You don't think I am crazy, do you?' Those were her words. Those were exactly her words."

The 1960 will recites: "I have two sisters, Amanda McKain Reeves and Alberta McKain Brown, who have means of their own, and who I have purposely left out of this will and it is my intent that they or neither of them take anything of my estate."

The testimony showed that Mrs. Reaves, a widow who was 73 years old at the time of the trial, was employed as hostess at an ante-bellum home in Natchez, Mississippi, from which she received a salary which netted her $139.40 per month. Her only

other income was $40.00 a month from rental of her late husband's law office. Mrs. Brown, also a widow, was 70 years old at the time of the trial. She had been employed as manager of a school lunch-room until her doctor advised her to quit work. She lives in New Mexico. She receives $40.00 a month from Social Security and $60.00 from a pension of her deceased son.

Mrs. Evelyn George, one of the special nurses attending the testatrix, testified to the following:

"Q    * * *  Did you discuss the Will, do you recall, with her in the hospital?

"A    Yes, I think—Yes, I did.

"Q    What was that discussion?

"A    Well she tried to explain why she had willed everything to her daughter.

"Q    How did she explain it?

"A    She said that her, she knew that she was going to be sick a long time and was going to take a lot to take care of her and it cost a lot to take care of her, and she wanted to be sure us girls got our pay and she could depend on Elizabeth to look after things and that is why she wanted her to have everything.

"Q    Did she have anything to say about her sisters?

"A    Well she said her sister went off and left her when she was sick and needed her most. And at another time she told me about them talking about her in the room when they thought she was unconscious.

"Q    And she told you about them talking about her?

"A    Yes.

"Q    What was that?

"A    Well she said that they, said that it would be better if she died then and so there would be something left.

"Q    She said the sisters said that?

"A    Yes, she said they were talking about her.

"Q    When they were in her room?

"A    In her room, yes.

"Q    And what was her condition at that time?

"A    Well, at the time they thought she was unconscious I guess but she was apparently coming out of the coma because she remembered what had been said.

"Q    She told you about this?

"A    She told me about it.

"Q    Do you recall when she told you?

"A    No, not having—

"Q    Was it after she left the hospital?

"A    She did that part of it, yes. She told me about that after she left the hospital.

"Q    After she left the hospital.

"A    But at the hospital she told me about making a Will because she wanted Elizabeth to have it so that she would be sure that we were paid and she would have something to take care of her with."

It is contended that the above-quoted statements ascribed to testatrix further evidenced on her part an irrationality and lack of testamentary capacity. It is asserted that the statements regarding the devise to Elizabeth so she could have enough to pay the nurses and also to look after testatrix might be interpreted as reflecting the be-

lief that the will would take effect at the time it was executed. Naturally, the sisters emphatically denied in their testimony that they had ever expressed the thought that it would be better if testatrix died while there was something left of her estate. Furthermore, the record shows that both sisters were attentive to and considerate of the testatrix during her illness. Mrs. Reaves, who had contrived to visit her sister each summer, testified that as soon as she heard of her sister's stroke she came to El Paso and stayed in the hospital room with her day and night until she had to return to work by the first of the following month. Mrs. Brown had lived with testatrix from 1906 to 1914, when Mrs. Brown married, and again in 1946 until 1951. She arrived in El Paso two days after her sister suffered the stroke, on May 6, 1960, and stayed in the hospital room with her, after Mrs. Reaves left, until July 10, 1960, sleeping on a cot in her sister's room. She left, she testified, when Dr. Gaddis and others advised her to because of the strain on her. She stated that private nurses were employed when she left.

We have refrained here from outlining the testimony of Proponent's witnesses as to testamentary capacity of the testatrix, having followed the rule set out in Great Atlantic & Pacific Tea Company v. Giles, supra, as to "no evidence" points. The first four points of error are overruled.

As to Point No. Five, the "insufficient evidence" point, having examined the entire evidence in this cause, we are again guided by the rule set out in 38 Texas Law Review, supra, at pages 367 and 368:

"If there is evidence of probative force tending to prove the existence of a vital fact and evidence tending to disprove its existence, and the point of error is that the finding is against the great weight and preponderance of the evidence, the rule by which a Court of Civil Appeals should be guided in passing on the point is simple even if the conclusion to be reached in a particular case is difficult. If the finding of the existence of the fact, considering all of the evidence, is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust, the court should sustain the point and order a new trial; otherwise, the court should overrule the point and affirm.

We are of the opinion that there is ample evidence in the record to support the jury's finding of lack of testamentary capacity at the time the 1960 will was executed by testatrix, and that therefore such finding was not so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. We accordingly overrule appellant's fifth point of error.

The sixth point of error attacks the trial court's ruling that all costs incurred be paid by appellant-proponent individually. Appellant's position is that since "she was appointed in a fiduciary capacity, both in the will of August 10, 1960, and by the Probate Court, and in offering said will for probate and resisting the contest filed thereon, she was fulfilling a requirement and duty imposed upon her by law and, therefor, said costs should not be taxed against her in any capacity or in any event, said costs should be taxed against her only in her fiduciary capacity and, therefore, paid by the estate * * *", citing McCannon v. McCannon, 2 S.W.2d 942 at page 951 (Tex.Civ.App., 1927; dism.).

Section 243, Chapter 7, Texas Probate Code, provides as follows:

"When any person designated as executor in a will, or as administrator with the will annexed, defends it or prosecutes any proceeding *in good faith, and with just cause,* for the purpose of having the will admitted to probate, whether successful or not, he shall be allowed out of the estate his

necessary expenses and disbursements, including reasonable attorney's fees, in such proceedings." (Emphasis supplied).

In the case of Casseb v. Sweeney, 252 S.W.2d 209 (Tex.Civ.App., 1952; Ref., N.R.E.), the appellant offered a will for probate, but his attorneys were unsuccessful, and another will was probated. Appellant filed suit for attorneys' fees against the executor who qualified under the probated will. After an adverse judgment, appeal was taken. The appellate court held:

"Before appellant could recover in this case it was necessary for him to *allege and prove* that in offering the will for probate he acted in good faith." (Emphasis supplied). (Citing McCannon v. McCannon, supra).

The court went on:

"Appellant had the burden of proving and soliciting a favorable finding from the jury to the effect that in offering the will for probate he acted in 'good faith,' as well as a finding of the reasonable value of the services rendered by the attorneys who represented him in the matter."

It is believed that the reasoning behind this holding is expressed in Huff v. Huff, 132 Tex. 540, 124 S.W.2d 327 (1939), wherein it is stated:

"\* \* \* By virtue of Article 3696 the costs were taxed against J. H. Huff. The terms of the will were favorable to him, and detrimental to the other heirs not named in the will. If he had succeeded, his share under the will would have been much larger than it was without the terms of the will; and if the will had been probated, it would have deprived the other heirs not named in the will of their share of the estate. He was defeated in his effort to probate such will, and the court costs were taxed against him by reason thereof. The effect of permitting him, after such defeat, to be reimbursed for costs and attorneys' fees, would be to cause the heirs not named in the will, although they prevailed, at their own expense, in establishing their rights in the estate, to have to pay not only the costs of such suit, but the attorneys' fees also, incurred by the executor in his effort to probate such will; while the named executor would pay nothing, although he was the loser in such suit."

Further:

"We think that the executor could have had submitted to the jury, along with the other issues, the question of good faith on his part in offering the will for probate; and if the jury had found that, under all the circumstances, he had acted in good faith, then he would have been entitled to judgment for such attorneys' fees and court costs. This was not done; and the judgment became final. We do not think the rule should be extended further than this, in order to let him recover in a subsequent proceeding."

We believe the stated principles are applicable here, even though in the Huff case he, as the named executor, was found guilty of undue influence upon the maker of the will—a situation not present here. In the instant case there was no pleading by the Proponent of the 1960 will alleging "good faith" and "just cause", and while there may be nothing shown to the contrary, the evidence does not affirmatively establish these matters, nor is there any showing of the amount of costs or attorney's fees owing, and no issue was requested or submitted to the jury on these elements.

In the light of the foregoing authorities, we are constrained to overrule Point of Error No. Six.

All points of error having been considered and overruled, the judgment of the trial court is accordingly in all things affirmed.