FILED
05/14/2018
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 28, 2018

**ANNE MARIE KENT v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Lewis County**
**No. 2015-CR-94     Michael Binkley, Judge**

_____

**No. M2017-01532-CCA-R3-PC**

_____

The Petitioner, Anne Marie Kent, was convicted by a Lewis County jury of two counts of aggravated child neglect or endangerment and two counts of child abuse and received an effective sentence of twenty-two years. The Petitioner filed a post-conviction petition alleging that she received ineffective assistance of counsel, which was subsequently denied by the post-conviction court. On appeal, the Petitioner asserts that trial counsel was ineffective by (1) failing to file a motion to change venue; (2) advising the Petitioner not to testify at trial; (3) failing to call a witness; and (4) failing to properly cross-examine a witness. Upon thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. Ross Dyer, JJ., joined.

Matthew J. Crigger, Brentwood, Tennessee, for the appellant, Anne Marie Kent.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Kim R. Helper, District Attorney General; and Jennifer Mason, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

**Trial**

The Petitioner and her husband, Mr. Steven Kent, adopted three children, two boys and one girl, before moving to Lewis County in 2004. The Petitioner's convictions arise from abuse inflicted upon the two boys between the dates of July 1, 2005, and November 10, 2009. The Petitioner was indicted on two counts of aggravated child neglect or endangerment and two counts of child abuse. The evidence presented at trial is summarized below.

Both victims testified at trial about the abuse allegations. Victim 1[1] was born in 1995, and victim 2 was born in 1997. They were adopted by the Kents and moved to Lewis County in 2004. The victims shared a bedroom, which consisted of two twin size beds, a dresser, and a closet. They did not have any books or toys in their bedroom. Victim 2 testified they initially had pictures hanging on their bedroom walls, but the Petitioner "ripped them all off." Victim 1 had a fitted sheet on his bed but did not have a flat sheet, blankets, or pillows, and victim 2's bed did not have any bedclothes at all.

The victims' sister had toys and electronics in her bedroom, and she had sheets, blankets, and pillows on her bed. Victim 2 testified that he and victim 1 were not allowed in their sister's room, noting that the Petitioner would "beat" them if they went into her room. Victim 1 explained that he and his brother had a box of toys that was kept outside when they first moved to Tennessee. The toys were never replaced if they broke, and sometimes the Petitioner would break their toys in front of them as a form of punishment. When the victims received toys as presents from family members, the Petitioner would take them away, but their sister was allowed to keep her presents. The victims were not allowed in the basement, and victim 2 stated that the Petitioner "beat him" because he "snuck down there one day."

The victims were not allowed to watch television and were not allowed in the living room except to pass through to access their bedroom. The victims were allowed to watch one Christmas special on television in 2004. They were not allowed to use the computer, nor were they allowed to ride in the go-cart. Their sister could watch television, use the computer, go into the living room, and ride in the go-cart. The victims could not choose their own clothes, but their sister could pick out her clothes from a store or order them online. Victim 1 testified that his shoes were often "the cheapest pair you could find," that sometimes he would have to wear women's shoes, and that his jeans were not long enough. Victim 1 testified that he and victim 2 took baths every two days, that they were not permitted to take showers, and that Mr. Kent had to supervise them while they bathed.

---

[1] It is a policy of this court to protect the identities of minors.

The victims' bedroom and their sister's bedroom were connected by a bathroom. The bi-fold door between the victims' bedroom and the bathroom was turned backward so that the victims could not access the bathroom from their bedroom. One year after moving into the house, the water to the bathroom sink was turned off. The victims could brush their teeth once a day, but they were not permitted to spit out the toothpaste or rinse their mouths. The Petitioner gave them a cup of water to be used to rinse their toothbrushes. They used the same toothbrushes for "three to four years."

The victims were not allowed to use the bathroom without first obtaining permission, and the Petitioner would watch them while they used the bathroom. If the victims tried to use the bathroom without permission, they would get in trouble, which normally resulted in being whipped with objects such as a "[b]elt, stick, rake handle, [and] board." Victim 1 said he was whipped "at least once a day." The victims also were prohibited from using the bathroom at night. The Petitioner built a "makeshift alarm," which consisted of a box of wooden blocks placed on top of a crate. The crate was placed against the bathroom door, so "if you push the door in[,] … it knocked [the box] over." Victim 1 explained that he had "more than five" accidents in his bed because he was not allowed to use the bathroom at night. Victim 2 had accidents and vomited in his bed because he could not access the bathroom. He explained that he would lie in his own vomit until the Petitioner allowed him to get out of bed the next morning. The victims had to go to bed around 6:00 or 7:00 p.m., but no later than 8:00 p.m. Victim 2 said that they were not allowed to get out of their beds in the morning until the Petitioner gave them permission.

Victim 2 testified that he and victim 1 had to get dressed in the kitchen every morning because the Petitioner wanted to watch victim 1 put on his pants. If victim 1 lost his balance or tripped while putting on his pants, the Petitioner made him start over "until he did it properly ten times." The victims were given the same breakfast every day: a bowl of moistened cereal with the milk drained out of it. The victims' sister got "pancakes, eggs, bacon, anything she wanted" for breakfast. The Petitioner packed the victims' school lunches every day. Victim 1 explained that he had different kinds of sandwiches and chips during the family's first year in Tennessee. After that year, the victims got the same lunch every day. Victim 1 explained that although he got three meals a day, he still went to bed hungry. The Petitioner determined how much food they could eat, and they were not allowed to have second servings of food. Their sister could have seconds, but if the victims asked for seconds, the Petitioner "would laugh and say no." If the victims did not finish their food on time or if there was not enough food left over for seconds, then the Petitioner would give the victims' food to their sister.

Victim 1 said the Petitioner punished him by forcing him to exercise and do "write-offs." He was given forty-five minutes to write sentences on pieces of paper. He

- 3 -

"normally" had to write "four pages front and back" within the time limit. If he failed to complete the write-offs in time or if his handwriting was not to the Petitioner's satisfaction, he had to exercise. The exercises consisted of running around the family's circle driveway and "squat thrusts or jumping jacks or something like that." After completing his exercises, he would do more write-offs. He testified that this cycle repeated "four to five times" on a school day and "ten to fifteen" times on a weekend. He stated that within a four-year period, his write-offs were considered "good enough" by the Petitioner on one or two occasions. Victim 1 acknowledged that he and victim 2 had poor penmanship and that he had to take a class from first through fourth grade to improve his handwriting.

Starting in 2006, victim 1 was required to run around the driveway every day until the Petitioner told him he could stop. If he was not running quickly enough, the Petitioner would chase him either on foot or on a four-wheeler. She sometimes would hit him with a stick if he did not run faster. Victim 1 saw victim 2 walk or run around the driveway "once or twice maybe." Victim 1 had to run in the cold, heat, and snow. He was allowed to go inside if it was raining but was required to do "squat thrusts or jumping jacks" until the Petitioner said he could stop. Victim 2 testified that they had to do "[j]umping jacks, squats, push-ups, [and] sit[]-ups" when it was raining outside. Victim 2 also testified that he once saw the Petitioner chasing victim 1 with a stick, that somebody pulled into the driveway and asked what was going on, and that the Petitioner responded that "she was not going to beat him. [She was] going to kill him with it."

On the typical school day, the victims rode the bus home from school, drank the small amount of water given to them in empty yogurt cups, changed out of their school clothes and shoes, and went outside where victim 1 would begin his write-offs. After arriving home from school, the victims were permitted to sit to change their shoes but were required to remain standing for the rest of the day until bedtime. Once the victims were outside, the Petitioner locked the door to the house and would not allow the victims to go inside. They remained outside until it was time for dinner. Victim 1 explained that he had to have his shoes untied before dinner began. If he did not have his shoes untied quickly enough, the Petitioner fed his dinner to the dog.

During dinner, the children were all separated from each other, and the victims had to remain standing while they ate. The Petitioner did not allow victim 1 to look at her, and he was whipped if he did so. If the victims did not finish their food by the time everyone else had finished or if they were eating too quickly, their food was taken away and fed to the dog. The victims were not allowed to access the refrigerator or have any snacks. Victim 2 testified that sometimes the Petitioner blended his meal together for him to eat. He said that he would sometimes throw up his dinner and that the Petitioner would "put soap in it and make [him] eat it again." He recalled being forced to eat his

- 4 -

vomit on multiple occasions while the Petitioner laughed. Victim 2 also testified that the Petitioner poured dish soap and chili powder down his throat.

At school, the victims were not allowed to participate in any class parties or field trips. Victim 1 went on one field trip not long after moving to Tennessee but was not allowed on any other trips during a five-year period. The victims were also not allowed to have any food or drinks during class parties, nor could they watch television or movies at school. Victim 2 noted that although he was allowed to attend school book fairs, the Petitioner did not let him buy any items.

The victims were not allowed to get a drink of water by themselves. Victim 1 explained that the Petitioner would allow them to have about six ounces of water, provided to them in an empty yogurt container, every "hour, hour and a half." Victim 2 described the yogurt containers and added that they had to drink out of "sippy cups." The victims' sister had free access to water. Victim 1 said he sometimes felt thirsty and dizzy, so he would try to find water to drink from a "water hose or one of the livestock buckets." Victim 2 said that they would drink water from the water hose or horse troughs and that the Petitioner would hit them and make them run laps if they were caught. The Petitioner put locks on the water spigots to prevent the victims from drinking out of them.

Victim 1 testified that he did not have any birthday parties and was not permitted to attend anyone else's parties. He and victim 2 were not allowed to go to church, but their sister could go. The family lived on a farm and put on a pumpkin patch festival each year starting in either 2006 or 2007. Schools would come to the festival, but victim 1 explained that he was not allowed to participate in any of the activities. He was once allowed to go on a hayride after everyone had left for the day, while his sister was allowed to participate in activities.

During the summer of 2009, the Petitioner required victim 1 to stay outside from 8:00 or 8:30 a.m. until 6:00 p.m. He was required to do write-offs and run laps around the driveway. The victims were only allowed inside the house if it was raining, but their sister could remain inside the house at any time. While the Petitioner raked the goat and horse barns every day, she required the victims to stand inside separate stalls. The victims had to face the corners of the stalls for about an hour each time. If they "even looked up or talked, [the Petitioner would] hit [them] with a rake." Victim 1 explained that the Petitioner put them in the horse stalls because they had "tried to run away a couple of times."

The Petitioner forced victim 1 to wear a diaper during the summer of 2009, when he was thirteen years old. Victim 1 explained that he wet himself since he was not allowed to use the bathroom when he needed to go. One day, the Duncan family was

dropping the victims' sister off after church and saw victim 1 in a diaper. Two weeks before school started, the Petitioner made victim 1 wear his diaper, shoes, and shirt, drove him to the Walmart parking lot, and threatened to make him get out of the vehicle. The Petitioner made him wear a diaper under his jeans to school "[a] couple times." When asked why he did not throw his diaper away once he arrived at school, he explained that the Petitioner would whip him for it. In July 2009, victim 1 was locked into what he described as a pigpen made out of dog kennel panels. The Petitioner tied the door shut so he could not get out and left him in the pen from "[e]arly afternoon to late in the evening." Victim 2 said that victim 1 could not get out of the pen because the Petitioner had put a padlock on the gate.

Victim 1 testified that the objects with which the Petitioner hit him "got bigger over time." He explained that he would "get in trouble for almost anything," including "for not standing in the same spot [he] was standing in before." He testified that the Petitioner would call him names such as "retarded" and "gay." When victim 1 expressed his desire to join the military, the Petitioner told him that he would never succeed, that "they don't allow gays in the military," and that "[t]hey don't allow people on medication" in the military. She also sometimes called victim 2 "stupid." Victim 1 explained that if he "stepped out of line," the Petitioner would hit him across the back with the rakes she used to clean the barns. He testified that on "at least two or three occasions," the Petitioner broke a rake handle by hitting him with it. He also saw victim 2 being hit with rakes and recalled the handle breaking on one occasion. Victim 1 described these beatings as painful but said that he never bled as a result.

Victim 2 said that he saw the Petitioner hit victim 1 with "a stick, rake, belt, riding crop and a metal horse brush with spikes at the end." He testified that he saw the Petitioner break at least seven rakes while hitting victim 1. Victim 2 said that he was hit with a "soap [sic] belt, the riding crop, the spiked horse brush, a board, a stick, and a rake," explaining that the Petitioner broke eight rakes while hitting him. He was never cut, but he did have bruises and was sore. Victim 2 said the Petitioner called him "[g]ood for nothing" and "a loser." She told victim 2 that he would never get a date and would never take a girl to a dance. He said that the Petitioner would hit them in whatever position they were in at the time and that sometimes they would "collapse after being hit so many times." He believed the Petitioner had fun when punishing them because she would smile and laugh while doing so.

Victim 2 said that Mr. Kent "spanked [him] every now and then against [Mr. Kent's] will," explaining that Mr. Kent tried to talk to the victims rather than hitting them. Mr. Kent would hit them with his hand and would only hit them three times. He said that Mr. Kent would cry after hitting them and that he would hit them when the

Petitioner told him to do so. Victim 2 testified that Mr. Kent was not around to see the Petitioner "beat" them.

Victim 1 testified that beginning in either 2007 or 2008, he was required to clean the toilet every night before dinner because sometimes he would "miss the commode." He explained that he missed because he was uncomfortable with the Petitioner standing behind him and watching. During the summer of 2009, victim 1 tried to commit suicide by consuming the toilet cleaner. When he drank the cleaner, the Petitioner sent him outside to run laps, did not call 9-1-1, and did not appear panicked or concerned.

The victims' sister testified that she was the biological half-sister of the victims, that she was adopted by the Petitioner and Mr. Kent, and that the family moved to Tennessee when she was in preschool. Her testimony was consistent with the victims' testimony regarding the abuse allegations. She also noted that if victim 1 looked at the Petitioner during dinner, then the Petitioner "would open the microwave door in his face." She stated that when the victims were forced to get dressed in the kitchen every morning, she noticed bruises on their backs and shoulders. She heard the Petitioner call the victims "useless" and tell them that they would never get married, get jobs, or be successful. She also said, "Anytime [the Petitioner] did not like what they were doing, she would hit them with a belt, a wet built [sic], a rake, or open board."

The State presented the testimony of twelve additional witnesses, including two expert witnesses. Mr. Eddie Duncan and Mrs. Kathy Duncan testified that they saw victim 1 on August 9, 2009, walking outside wearing only a diaper. The Duncans also corroborated the victims' testimony that they had to do write-offs, that their clothes were too small, and that they had to drink from "sippy cups."

Four of victim 2's teachers each testified about victim 2's clothing not fitting properly, his lack of cleanliness, his dietary restrictions, and his restrictions against participating in class parties and watching class movies. The school guidance counselor testified that she reported the children to the Department of Children's Services ("DCS") after having a discussion with victim 1 about his home life. Victim 1 made a statement the guidance counselor believed meant that he did not want to go on living, and she estimated, based on her own physical observation, that he had lost thirty to forty pounds within one year.

Mr. Ralph Tackett testified that the three children lived with him and his wife for approximately a month and a half after they were removed from the Petitioner's home. He testified that the children's clothes were ill-fitting and dirty, that the children lacked basic knowledge of proper hygiene, and that the victims told him about the abuse allegations that occurred in the Kent home.

Ms. Stephanie Dunn, who worked for DCS, received a referral on August 25, 2009, reporting "nutritional neglect and psychological harm" of victim 1. In response, Ms. Dunn and another DCS worker visited the Kent home that evening, and during the home visit, Ms. Dunn saw the victims' sparse bedroom and the backwards bi-fold door to the bathroom. She also observed the victims in bed, without any bedclothes, and with victim 1 wearing only a diaper. She described victim 1 as "very slender" and as having "absolutely no body fat." She asked the Petitioner about the diaper, and she explained that victim 1 had trouble going the bathroom and missed the toilet. The Petitioner also explained that she had cut victim 1's underwear because he kept having accidents, that the victims were not allowed to get out of bed unless given permission, that she determined the victims' portion sizes for every meal, and that victim 1 had to do timed write-offs and was disciplined if he did not timely complete them. Ms. Dunn continued her investigation by interviewing school staff, the principal, the guidance counselor, and several teachers; however, none of them indicated any behavioral issues with either victim.

Ms. Dunn received a second referral on September 4, 2009, regarding physical abuse of the victims. Ms. Dunn conducted multiple visits to the school, during which she spoke with the children. Victim 1 was reluctant to speak with Ms. Dunn about the situation, and neither victim would allow Ms. Dunn to look at their bodies. She noticed that the victims' clothes were too small and torn, while their sister was well-dressed. On November 3, 2009, Ms. Dunn visited the Kent home again and spoke with each child individually. The Petitioner told Ms. Dunn that victim 1 was a sociopath, a liar, narcissistic, and had a syndrome where he tried to get people to do things for him. The Petitioner insisted that victim 1 needed to wear his diaper at night and on the weekends but admitted that victim 1 had not had any accidents since Ms. Dunn became involved. The Petitioner also informed Ms. Dunn that victim 1 had tried to run away on multiple occasions and that the children were lying if they claimed they were being physically abused.

The next day, Mr. Kent went to Ms. Dunn's office and spoke to her. Based on the information he provided, she again visited the school to speak with the children, the guidance counselor, and additional teachers. The children were more open with her after her conversation with Mr. Kent. On November 10, 2009, Ms. Dunn had a meeting with the Petitioner and Mr. Kent. During the meeting, the Petitioner admitted to many of the allegations. As a result of this meeting, the children were removed from the Kent home.

While the children were living with the Tacketts, the victims allowed Ms. Dunn to observe their bodies and photograph the bruises on them. Victim 1 had bruises on his buttocks, which she described as "purple linear lines." Victim 2 had bruises on his side and his back. Ms. Dunn also testified that Mr. Kent was charged in connection with the

allegations and, prior to the Petitioner's trial, pleaded guilty to facilitation of aggravated child abuse and neglect, receiving four and one-half years of probation.

On cross-examination, Ms. Dunn explained that she reported to a doctor that victim 1 had lost fifty pounds because it was part of the information she received in a referral. She noted that when she sets an appointment for a child to have a psychological evaluation, she gives all of the information she has gathered about the child. She acknowledged that she requested a full skeletal survey and a well-being check-up to be conducted on both victims. However, the skeletal survey was never conducted. She acknowledged that after the victims were examined by a doctor, no follow-up was required. She agreed that she never observed any broken bones or cuts on the children. She acknowledged that the medical records she reviewed during her investigation did not document the victims' weights, but she noted that the victims' weights steadily increased after they were removed from the Kent home. The victims met with a licensed clinical social worker, and as a result of this evaluation, DCS set up further psychological evaluations and a medical evaluation. The victims were also enrolled in counseling.

Dr. Lottie Walker, a licensed medical doctor with a subspecialty in child psychiatry, treated the victims while they were living with the Petitioner. She testified that she first meet with the victims in 2004; that victim 1 had been previously diagnosed with attention deficit hyperactivity disorder and autism spectrum disorder; and that victim 2 had been previously diagnosed with bipolar disorder, attention deficit hyperactivity disorder, and autism spectrum disorder. The Petitioner did the majority of the talking during the victims' appointments, and Dr. Lottie Walker adjusted the victims' medications based on information provided by the Petitioner.

Dr. Mary Cox, a doctor of psychology, provided expert testimony regarding her treatment of the victims. She began treating victim 1 in September 2009, and although victim 1 discussed the abuse allegations, he did not report that the Petitioner beat him. Dr. Cox began treating victim 2 in March 2010, and she believed that, based on his limitations, he would not be able to maintain a consistent lie over a long period of time.

Dr. Stephen Montgomery, a forensic psychiatrist, provided expert testimony regarding his evaluations of the victims. He diagnosed victim 2 with post-traumatic stress disorder ("PTSD") and concluded that the mental health and welfare of both victims were adversely affected by the trauma inflicted by the Petitioner.

The defense presented the testimony of fourteen witnesses, including one expert witness. Victim 2's educational assistant in 2005 testified that he was "impulsive," that his clothes were "fine," and that she never observed any bruising on him. Victim 2's second grader teacher stated that he was well-dressed and always had a lunch. A teacher

who taught both victims stated that they always had a lunch but that they did not have clean clothes and appeared dirty. The middle school principal testified about the children's appearance and behavior after they had been removed from the Kent home. The special education director at the middle school testified that the Petitioner attended parent-teacher conferences even after the children had been removed from the home, that the director did not get along well with Mr. Kent, and that he tried to make her miserable when he interacted with her.

Two witnesses testified that they supervised some of the Petitioner's visitations with the children after they had been removed from the home and that the children appeared affectionate toward the Petitioner and showed no signs of fear. One of these witnesses also taught parenting education classes to the Petitioner, during which the Petitioner admitted to taking victim 1 to the Walmart parking lot in his diaper, putting soap on victim 2's zippers and sleeves to prevent him from chewing on his clothes, making the victims face away from each other during dinner, limiting the time the victims had to eat, and giving any food scraps to the dog.

The defense presented the testimony of six other witnesses who testified that they did not observe any of the abuse allegations during their interactions with the Kent family. Three of the witnesses, however, testified that they observed the victims running around outside with pen and paper in their hands.

Dr. James Walker, a forensic neuropsychologist, provided expert testimony regarding his psychological evaluations of the victims. He said that both victims denied any symptoms of PTSD and were defensive. He did not believe victim 2 had any appreciation of the allegations against the Petitioner, noting that victim 2 had a tendency to exaggerate. He concluded that, based on his testing, neither victim had PTSD. He agreed, based on the allegations he could verify through outside sources, that both victims' mental health and welfare were adversely affected by the Petitioner's actions.

The defense also introduced multiple photographs into evidence, including a photograph of victim 2 and his teacher when he received an award, four photographs of victim 2 at the pumpkin patch festival, and a photograph of the Petitioner and victim 2 together.

Ms. Michelle Delk testified on behalf of the State on rebuttal that she worked for DCS and that she was involved in a meeting on November 10, 2009, wherein the Petitioner admitted to many of the abuse allegations.

The jury returned guilty verdicts for all four counts as charged. The Petitioner was sentenced to eleven years for Count 1, aggravated child neglect or endangerment of

victim 1; eleven years for Count 2, aggravated child neglect or endangerment of victim 2; eleven months and twenty-nine days for Count 3, child abuse of victim 1; and eleven months and twenty-nine days for Count 4, child abuse of victim 2. The sentence for Count 2 ran consecutively to Count 1 while the sentences for Counts 3 and 4 ran concurrently to Counts 1 and 2, respectively, for an effective sentence of twenty-two years.

The Petitioner appealed with the assistance of new appellate counsel and pursuant to this court's granting of the Petitioner's motion to accept a late-filed notice of appeal. Appellate counsel failed to timely file a brief after this court granted multiple extensions, and the appeal was involuntarily dismissed. *See State v. Anne Kent*, No. M2013-02874-CCA-R3-CD (Tenn. Crim. App. May 1, 2015) (order), *perm app. denied* (Tenn. Aug. 12, 2015). The Petitioner, while still represented by appellate counsel, filed a timely petition for post-conviction relief wherein she alleged she received ineffective assistance of trial counsel. The post-conviction court determined that the Petitioner may have a colorable claim of ineffective assistance of appellate counsel and decided that the Petitioner could not waive such a conflict. The post-conviction court appointed new post-conviction counsel, who then filed an amended post-conviction petition.

## Post-Conviction Hearing

During the post-conviction hearing, Mrs. Amy Tackett testified that she and her husband fostered the three children after they were removed from the Kent home. She stated she had posted messages regarding the children on an online forum called Lewis County Talk, which was defunct by the time of the hearing. Only members who had a username and password could access the forum, and she did not know how many members were on the forum. Messages could be sent privately from one member to another or posted where any member could see it. When shown some of the messages she had posted regarding the Kent family, she identified two of the messages as privately sent to another member, but she could not determine if the other messages were private messages or posted where all the members could see them.

Ms. Dunn testified at the post-conviction hearing that she was "fairly certain" trial counsel cross-examined her at trial with the case recording summary she had prepared summarizing the progress of the DCS investigation and the final decisions. She further testified consistently with her trial testimony concerning some of the abuse allegations from her investigation. Ms. Dunn explained that it is not uncommon for children not to initially disclose everything in the beginning of a case. She said the victims did not begin speaking freely about the abuse until Mr. Kent told them it was fine for them to do so.

- 11 -

Ms. Dunn testified that Mr. Kent indicated he wanted to speak with her alone following one of her home visits. She was unaware that the Kents were getting divorced at that time. Mr. Kent sent four or five emails about the circumstances in the home. His first few emails described what he had observed within the home, while the last few emails stated he wanted to get help for the children. Ms. Dunn testified that although she received information from Mr. Kent, she based her investigation on the disclosures made by the children. She did not trust Mr. Kent, stating, "I felt like, as a parent, he was in that home. He watched this abuse and allowed it." She stated that the more conversations she had with the children, the more information the children disclosed. Ms. Dunn also received additional referrals that prompted further discussions with the children.

On cross-examination, Ms. Dunn explained that even though Mr. Kent "gave the green light" for the children to freely speak with Ms. Dunn, she still had to build a rapport with the children before they would trust her and discuss the abuse with her. She gathered information from teachers, Dr. Lottie Walker, and Dr. Cox, and she then asked the children about this information. That was when victim 2 began to open up about the abuse that victim 1 had endured. These interviews were followed by a team meeting, during which Mr. Kent and the Petitioner began confirming the allegations. Ms. Dunn explained that Mr. Kent and the Petitioner "c[a]me to blows" during the meeting and began discussing "what's really been happening." The Petitioner admitted to some of the allegations, which confirmed what the victims had already told Ms. Dunn. Some of the other allegations had been verified through Ms. Dunn's conversations with neighbors, teachers, and counselors. She noted that the Petitioner maintained that she had a justification for many of the allegations. After the meeting, the children were removed from the Kent home.

The victims' uncle testified that he was the brother of Mr. Kent and that he moved to Tennessee from New York in June 2010. He became aware of the allegations against the Petitioner between October and December 2009. He had visited the Kents for a few days in October 2009, but he did not notice anything indicative of abuse at that time. He spent a few hours at the Kent farm during his visit. He also stated that victim 2 lived with him from June to October of 2016. He explained that victim 2 struggled with daily living skills such as personal hygiene and doing laundry. He noted that victim 2 would not always tell the truth and explained that he was not sure if victim 2 was lying to him or if he just did not understand reality. The uncle stated that he did not have as much experience with victim 1 and that victim 1 had been living with Mr. Kent. He testified that Mr. Kent was put in a nursing home prior to the hearing and that he had power of attorney over Mr. Kent.

The uncle was shown multiple photographs, which showed the children opening Christmas presents, decorating a Christmas tree, playing on a jungle gym, riding in a go-

cart, and riding horses. There were photographs of a cake that said, "Happy 10th Birthday, [victim 1]," and another cake that said, "Happy 8th Birthday, [victim 2]." He explained that he found these photographs on Mr. Kent's computer after he had obtained power of attorney. He believed he did not have access to these photographs until after the Petitioner's trial had concluded. He believed that trial counsel had talked to him on one occasion and that trial counsel's wife or secretary had interviewed him before trial. He said he was subpoenaed as a witness, was not allowed in the courtroom during the trial, but was never called to testify.

On cross-examination, he did not recall whether Mr. Kent was in a nursing home during the Petitioner's trial. He acknowledged he did not have possession of the photographs before Mr. Kent entered the nursing home. He agreed the photographs of the victims' birthday cakes would have been taken in 2005 when the victims were turning ten and eight, respectively. He acknowledged that he did not know when the remaining photographs were taken and stated that he was unable to determine the ages of the children based on how they appeared in the photographs. He acknowledged that when he visited the Kent farm in 2009, he did not look through the refrigerator or kitchen cabinets, nor did he look in any of the bedrooms. He explained that he did not spend much time with the children in 2009 because he was living in New York. When asked if he had a close enough relationship with the victims at the time of the trial to testify about their credibility and truthfulness, he responded, "I don't know how truthful — I don't know if I knew that or not." When asked if he had the same opinion of the victims at the time of trial as he had at the time of the post-conviction hearing, he responded that he would have had the same opinion about victim 2 but that he was not around victim 1 enough to determine that. He stated that victim 2's "perspective [wa]s off," but he did not consider victim 2 to be a liar.

The Petitioner testified that she lived in New York for her entire life until she moved to Tennessee on July 22, 2004. She and Mr. Kent cared for the victims as foster children before formally adopting them in 2001. Prior to adopting the children, they completed a ten-week training program, and after adopting the victims, she joined a foster parent support group. She explained that Mr. Kent was diagnosed with multiple sclerosis in 2008 and that he became "very angry and bitter" after being diagnosed. She asked Mr. Kent for a divorce in May or June of 2009. He initially said he would grant her a divorce as long as she did not hire a lawyer. He also agreed to let her stay on the farm with the children. She waited for a divorce without anything happening until Ms. Dunn showed up at their house on August 25, 2009.

The Petitioner denied that she restricted the victims from using the bathroom, that she watched the victims use the bathroom, that victim 1 drank toilet cleaner, that she chased the victims with a stick, that she broke a rake over the victims' backs, that she hit

- 13 -

the victims with any objects other than a piece of wood built by Mr. Kent, that she called the victims names, that she broke the victims' toys in front of them, that victim 1 had any dietary restriction, and that she withheld water from the victims. She explained that the victims did not get invited to their friends' houses, that the victims were allowed to play on the family's jungle gym until it broke, that she put victim 1 in the alpaca pen because he was attacking victim 2, that victim 1 put himself in the barn stalls when he began to fight with victim 2, that she separated the children during dinner because they would fight and throw food, and that Mr. Kent made victim 1 take his clothes off on the day the Duncans saw him because he had gotten his clothes wet. She also explained that victim 1 was required to do write-offs because he "purposely miss[ed] the toilet" or used the bathroom in the bathtub and because he did not like writing. She said she took the victims' bedclothes away because victim 2 was wrapping the sheets around his neck to be like "Superman." She stated that only the water to the bathroom sink was turned off but that she did now know why it was off.

The Petitioner stated that she was ready to testify during the trial but that trial counsel advised her it would be better if he addressed the issues in closing argument. She agreed that she told the trial court she understood her right to testify and chose not to testify. She said she decided not to testify based on trial counsel's advice. On cross-examination, the Petitioner did not recall whether she was under oath when she told the court she was waiving her right to testify. She acknowledged that she was advised by trial counsel that the decision whether to testify was her decision to make.

Trial counsel testified that he was licensed in another state from 1990 through 2001 and that he was licensed in Tennessee since 2006. He described his practice at the time of trial as eighty to ninety percent criminal defense. He believed he was hired by the Petitioner in December 2010. He stated that he considered filing a motion for a change of venue. After "hundreds of pages of research," he could not find a credible basis for filing the motion. He stated that he had some print-outs of posts on Lewis County Talk prior to trial. When shown the posts entered as exhibits at the post-conviction hearing, he stated that he had "at least some of them" prior to trial. He explained that at the time of trial, there was controversy as to whether online postings of this type would constitute publicity since the posts were not disseminated to the public. He believed he had a "better chance" arguing that the posts constituted jury contamination. He said that he "repeatedly" asked the prospective jurors during voir dire about Lewis County Talk and that he believed he was successful in removing any prospective jurors with any prior knowledge about the case. He did not have any reason to believe the jurors lied about their prior knowledge.

Trial counsel stated that the charges were not based on allegations made by the children but, instead, were based on the investigation conducted by Ms. Dunn. He

explained that he filed five motions challenging Ms. Dunn's qualifications and competence in her investigation. When asked if the credibility of the victims was a key issue in the case, he explained that "it was not that simple." He said that the State incorrectly asserted in its opening statement that the Petitioner had denied all of the allegations. He said the case was not a matter of having the Petitioner testify and deny the allegations or even a matter of shifting the blame to Mr. Kent; instead, he determined that attacking Ms. Dunn's investigation was important because he believed it was "contaminated." He explained the "most disturbing" part of the case was that the children's "statements were amazingly consistent." In response to this, he had an expert analyze whether the children were malingering.

Trial counsel summarized his ultimate strategy as mitigating so that the jury's option was limited to finding the Petitioner guilty of a misdemeanor rather than a felony. He acknowledged that challenging the victims' credibility was part of the strategy but clarified that he could not rely on credibility alone. When asked how much of his trial strategy focused on showing that Mr. Kent had made the allegations against the Petitioner in an effort to gain leverage in the divorce proceedings, he explained that he made that a central point in his opening statement, which he considered "not … the smartest thing to do." He explained that the trial court "limited [his] attack upon the forensic training of [Ms.] Dunn" and that "[Mr.] Kent's allegations really had very little to do with the jury's consideration."

Trial counsel testified that prior to trial, he reviewed the DCS case recording summary and the DCS reports, which "took up nearly a banker's box." He recalled cross-examining Ms. Dunn at trial but did not recall the specifics of his questions. He disagreed that the primary purpose of his cross-examination was to focus on the weight loss allegation and the lack of evidence of physical abuse. When asked if he recalled going through the case recording summary with Ms. Dunn, he replied, "I think my cross-examination was thorough…. I'm not sure."

Trial counsel stated that he received family photographs prior to trial and that he entered some into evidence during the trial. He reviewed the photographs that were entered as exhibits at the post-conviction hearing and stated that he had seen some of the photographs before. When asked why he would not have introduced all of the photographs at trial, he said they were "remote in time."

The Petitioner had asked trial counsel whether he recommended her to testify or not, and he did not recommend her to do so. The Petitioner "tended not to answer questions directly," "tended to be less than clear," and "very often failed to see her own actions from the perspective that other people seem to perceive [them]." He told the Petitioner that whether she testified was her decision to make.

On cross-examination, trial counsel agreed that he filed over twenty pretrial motions. He stated that his motion for a bill of particulars was granted and that receiving the bill of particulars provided an outline of the allegations the State intended to raise at trial. He noted that he filed a motion to sever the counts in the indictment because he believed a jury would be more inclined to understand the Petitioner's justifications and explanations for her behavior when looking at specific incidents or when listening to only one victim's testimony. He testified that the family photographs he entered during the trial were obtained from the Petitioner. He did not believe the photographs entered during the post-conviction hearing were from the same timeframe as those introduced during the trial.

Trial counsel agreed that he used the DCS records to cross-examine both victims, as well as Ms. Dunn. He stated that he subpoenaed the victims' uncle as a witness but that the uncle "was beyond frustrated" that he was subpoenaed. During each telephone interview with the uncle, he said he did not have anything helpful to tell because he was not around during the time period at issue. Trial counsel acknowledged that he called fourteen witnesses on behalf of the defense, which included one expert witness.

Trial counsel stated that he was not aware of any publicity about the case except for the Lewis County Talk posts, a newspaper article that reported the Kents had filed for divorce, and an article that said charges had been filed against the Petitioner and that there had been a bond hearing. He said he was "affirmatively convinced" these articles and posts did not contaminate the jury pool. He believed the jury that was selected was not biased. He "[e]xtensively" questioned the prospective jurors in voir dire about any prior knowledge of the case.

Trial counsel said it was "absolutely" the Petitioner's decision not to testify at trial. He asked her to "sleep on it overnight" before deciding whether to testify because of the number of witnesses they had heard on behalf of the State. He also had concerns about the allegations to which she admitted when being interviewed by Dr. James Walker.

Two of the jurors on the case testified on behalf of the State. One of the jurors was dismissed before jury deliberations began due to a family emergency. The other juror was elected as the jury foreperson. Both jurors testified that they had no knowledge about the case before the trial began, neither had read anything online or in the newspaper, and neither had heard anything about the case from the community. The jury foreperson testified that during jury selection she overheard a man saying that the case involved child abuse and that he knew the Petitioner. The man was dismissed, and the jury foreperson testified that overhearing the conversation did not change her opinion of

- 16 -

the case because she initially did not know to which case the man was referring and she forgot about the comments once the trial began.

The post-conviction court denied relief in a written order, making detailed findings that the Petitioner failed to establish either deficiency or prejudice as to each claim of ineffective assistance. The Petitioner now appeals.

**ANALYSIS**

On appeal, the Petitioner claims counsel was ineffective by failing to file a motion for change of venue, advising the Petitioner not to testify at trial, failing to call the victims' uncle as a witness at trial, and failing to properly cross-examine Ms. Dunn. The State responds that the Petitioner has not met her burden of proving deficiency and prejudice for each allegation.

To be granted post-conviction relief, a petitioner must establish that his conviction or sentence is void or voidable due to the abridgement of any constitutional right. T.C.A. § 40-30-103. The petitioner has the burden of proving the allegations of fact by clear and convincing evidence. *Id.* § 40-30-110(f); *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). Factual findings by the post-conviction court are conclusive on appeal unless the evidence preponderates against them. *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010). This court may not substitute its inferences for those drawn by the trial judge, and "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge." *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997).

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantees the accused the right to effective assistance of counsel. To prevail on a claim for ineffective assistance, a petitioner must prove "that counsel's performance was deficient and that the deficiency prejudiced the defense." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

To demonstrate deficiency, a petitioner must show "'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 687). A petitioner "'must show that counsel's representation fell below an objective standard of reasonableness' guided by 'professional norms' prevailing

- 17 -

at the time of trial." *Id.* (quoting *Strickland*, 466 U.S. at 688) (internal quotations omitted). On review, counsel's performance is not to be measured by "20-20 hindsight." *Id.* at 277. Instead, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (citing *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999)). The court must presume that counsel's acts might be "'sound trial strategy,'" and strategic decisions are "'virtually unchallengeable'" when made after a thorough investigation. *Id.* (quoting *Strickland*, 466 U.S. at 689).

To establish prejudice, "a petitioner must establish 'a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. A petitioner must show that counsel's performance was so deficient that it deprived the petitioner "of a fair trial and called into question the reliability of the outcome." *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Burns*, 6 S.W.3d at 463).

Claims of ineffective assistance of counsel in post-conviction petitions are regarded as mixed questions of law and fact. *Grindstaff*, 297 S.W.3d at 216. Thus, our review is de novo with no presumption of correctness. *Pylant v. State*, 263 S.W.3d 854, 867-68 (Tenn. 2008) (citing *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007)). "Failure to establish either deficient performance or prejudice necessarily precludes relief." *Felts*, 354 S.W.3d at 276.

### I. Motion to Change Venue

The Petitioner argues that trial counsel was ineffective by failing to file a motion to change venue and that there is a reasonable probability the outcome of the trial would have been different had the jury not been exposed to "inflammatory online comments."

Venue may be changed "when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." Tenn. R. Crim. P. 21(a). "The ultimate test is whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity." *State v. Kyger*, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989). "The mere fact that jurors have been exposed to pre-trial publicity will not warrant a change of venue." *State v. Mann*, 959 S.W.2d 503, 532 (Tenn. 1997); *see also Keith Whited v. State*, No. M2012-02294-CCA-R3-PC, 2014 WL 1832962, at *12 (Tenn. Crim. App. May 7, 2014) ("Prejudice will not be presumed by a mere showing that there was considerable pretrial publicity."). Instead, a "defendant must demonstrate that the jurors who actually sat were biased or prejudiced against him." *State v. Evans*, 383 S.W.2d 185, 192 (Tenn. 1992).

In its written order, the post-conviction court found that the posts on the Lewis County Talk forum did not rise to the level of causing undue excitement and that the posts did not permeate the area from which the jury was drawn. The court noted that the trial court was aware of the posts and carefully questioned the prospective jurors during voir dire, which resulted in a jury without any prior knowledge of the underlying facts of the case. The evidence does not preponderate against the post-conviction court's findings. *See Ward*, 315 S.W.3d 465. Trial counsel testified he considered filing a motion for a change of venue but, after further researching the issue, determined that there was no credible basis for filing the motion. Our review of the record shows that the prospective jurors were questioned about their knowledge of the allegations, parties, victims, and witnesses in the case. The prospective jurors who indicated they had prior knowledge or knew anyone involved in the case were dismissed. Moreover, the Petitioner did not present any evidence of actual bias or prejudice in the selected jury. *See Evans*, 383 S.W.2d at 192. We, thus, conclude that the Petitioner has not shown trial counsel was deficient or any resulting prejudice.

## II. Right to Testify

The Petitioner asserts that counsel was ineffective by advising her not to testify at trial. This court has previously considered five factors that tend to indicate whether trial counsel's advice that a defendant not testify constitutes ineffective assistance:

> (1) only the victim and the defendant were present when the offense was committed;
> (2) only the defendant could present a "full version of [his] theory of the facts";
> (3) the defendant's testimony could not be impeached by prior criminal convictions;
> (4) the defendant could give an account of the relationship with the victim; and
> (5) the attorney had let in objectionable, prejudicial testimony with the intention of clarifying it with the testimony of the defendant.

*Bates v. State*, 973 S.W.2d 615, 636 (Tenn. Crim. App. 1997) (citing *State v. Zimmerman*, 823 S.W.2d 220, 227 (Tenn. Crim. App. 1991)). To overcome the strong presumption that trial counsel's performance fell within the wide range of reasonable professional assistance, "the petitioner must show that the alleged deficiency was unsound trial strategy." *Id.* (citing *Strickland*, 466 U.S. at 689; *Hartman v. State*, 896 S.W.2d 94, 104 (Tenn. 1995)).

The Petitioner asserts that the factors in *Bates* weigh in favor of finding ineffective assistance of counsel because she and the victims were the only ones present when most of the abuse occurred, only the Petitioner could present her full version of the story, the Petitioner did not have any prior convictions that could be used for impeachment purposes, and the Petitioner could explain her relationship with the victims and the difficulties of parenting that led to her strict policies.

In its order denying relief, the post-conviction court noted that trial counsel advised the Petitioner of the benefits and detriments of testifying and explained the decision was for the Petitioner to make. The court also stated that the Petitioner testified at a jury-out hearing that she was waiving her right to testify and that it was her decision to do so. The court determined the allegations involved multiple actions over a span of years of abuse. The court acknowledged that although the Petitioner and victims were sometimes the only ones present through the abuse, Mr. Kent and the victims' sister were sometimes present, and Ms. Dunn witnessed some of the abuse allegations. The court noted the Petitioner was likely the only person who could explain her disciplinary methods and her relationship with the victims. The court stated that the Petitioner expressed "little to no remorse for her actions and appeared to find her parenting methods were validated," noting that her testimony "likely would have opened her up to more pitfalls on cross-examination." The court found that the Petitioner decided not to testify "after receiving careful and thorough advice from [trial counsel]."

The post-conviction court was correct in determining that although some of the *Bates* factors listed above are applicable, the Petitioner made her own decision not to testify based on the strategic recommendation of trial counsel. Trial counsel stated that he advised the Petitioner against testifying because she tended not to answer questions directly and failed to see her actions from the perspective of others. Trial counsel also had concerns about the allegations to which the Petitioner admitted in her interview with Dr. James Walker. The Petitioner was advised that the decision to testify was for her to make and that she should "sleep on it" before making her final decision. The Petitioner acknowledged that she told the trial court she understood her right to testify and chose to waive it. We conclude that the Petitioner made her own decision not to testify and that trial counsel's recommendation was based on reasonable trial strategy, which we will not review with the benefit of hindsight. *See Felts*, 354 S.W.3d at 276; *Bates*, 973 S.W.2d at 636. The Petitioner has not established that trial counsel was deficient and is accordingly not entitled to relief on this ground.

### III. Failure to Call a Witness

The Petitioner maintains that counsel was ineffective by failing to call the victims' uncle as a witness because he could testify about the truthfulness of the victims and could

present photographs that show the victims celebrating holidays and participating in fun activities. The Petitioner specifically asserts in her brief that the uncle's testimony would have been both admissible and material "to paint a different picture of life in the Kent home and to challenge the credibility of the children."

"When a petitioner presents at the post-conviction hearing a witness he claims should have been called at trial, the post-conviction court must determine whether the testimony would have been (1) admissible at trial and (2) material to the defense." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008). The post-conviction court can find that trial counsel was not deficient where it finds the proffered testimony either would have been inadmissible or "would not have materially aided the petitioner's defense at trial." *Id.* If, however, the court finds the testimony admissible and material, the court must then determine whether the witness was credible. *Id.* at 869-70.

The Petitioner asserts the victims' uncle could have challenged the credibility of the victims' testimony at trial. The post-conviction court concluded in its written order that the uncle's testimony would have been admissible at trial. The court further concluded, however, that his testimony was not material to the Petitioner's defense because he did not spend much time with the victims when the abuse occurred. The post-conviction court also relied upon the fact that the victims' uncle stated that he did not know if he could have testified about the victims' truthfulness. We agree with the post-conviction court that the uncle's testimony would not have been material to the Petitioner's defense. When asked whether he could have testified about the victim's credibility and truthfulness at the time of trial, the victims' uncle responded, "I don't know how truthful — I don't know if I knew that or not." He did not believe he was around victim 1 enough prior to trial to have had an opinion as to his credibility at that time. He believed his opinion of victim 2 would have been the same at trial as it was at the post-conviction hearing, stating victim 2's "perspective [wa]s off" and that sometimes he was unsure whether victim 2 was lying to him or just did not understand reality. Trial counsel stated that the uncle was adamant prior to trial that he did not have anything helpful to say and that the uncle "was beyond frustrated" he was even subpoenaed. Trial counsel called fourteen witnesses, many of which testified about their personal experiences with the victims. Trial counsel also presented the expert testimony of Dr. James Walker, who was specifically asked to evaluate whether the victims were malingering.

The Petitioner also asserts that the photographs provided by the victims' uncle would have shown a different perspective on life in the Kent household. The post-conviction court determined that the photographs, though likely admissible, were not in the uncle's possession at the time of trial and were not material because they depict events occurring before 2008 and 2009. The victims' uncle testified that he did not have

possession of the photographs until granted power of attorney when Mr. Kent went into a nursing home, which the uncle believed was after the trial had already concluded. Trial counsel testified that he believed he had seen some of the photographs prior to trial but that he would not have admitted them at trial because he considered them to be remote in time. Although the Petitioner was indicted for abuse between 2005 and 2009, the victims were clear in their testimony that the abuse worsened over the years, with much of the trial focusing on events that occurred in 2009. Trial counsel admitted into evidence similar photographs that depicted the victims participating in fun activities on the Kent farm. Accordingly, we conclude that trial counsel was not deficient and that the Petitioner, therefore, is not entitled to relief.

## IV. Failure to Effectively Cross-Examine a Witness

The Petitioner argues that trial counsel should have cross-examined Ms. Dunn with the DCS case recording summary and that an effective cross-examination would have revealed the abuse allegations became more serious after Mr. Kent began communicating with Ms. Dunn. "[C]ross-examination is a strategic and tactical decision of trial counsel, which is not to be measured by hindsight." *State v. Kerley*, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991). "[S]trategic decisions during cross-examination are judged from counsel's perspective at the point of time they were made in light of the facts and circumstances at that time." *Johnnie W. Reeves v. State*, No. M2004-02642-CCA-R3-PC, 2006 WL 360380, at *10 (Tenn. Crim. App. Feb. 16, 2006) (citing *Strickland*, 466 U.S. at 690). "Allegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." *Taylor v. State*, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991).

In denying relief, the post-conviction court found that trial counsel thoroughly questioned Ms. Dunn about the allegations regarding nutritional neglect. The court also noted that trial counsel attempted to get Ms. Dunn to elaborate on her analysis in the DCS case recording summary both to attack the weight-loss allegations and to combat other medical reports. The court further found that trial counsel appeared to have made a tactical decision by not further expanding on the nature and timing of the allegations.

We first note that the Petitioner fails to indicate in her brief which parts of the 148 pages of the DCS case recording summary that trial counsel should have questioned Ms. Dunn about during cross-examination. Instead, the Petitioner asserts that a proper cross-examination would have shown that after Mr. Kent became involved with the investigation, the allegations became more serious and severe physical abuse allegations arose. Our review of the record, however, shows that Ms. Dunn testified at trial that she received a second referral which alleged physical abuse on September 4, 2009. She continued her investigation, and on November 3, 2009, she conducted her second visit to

the Kent home. The following day, which was two months after Ms. Dunn received the referral regarding physical abuse of the victims, Mr. Kent visited Ms. Dunn. After this visit, Ms. Dunn continued her investigation by further interviewing the children, the guidance counselor, and additional school teachers. Although Ms. Dunn stated during the post-conviction hearing that she also received four or five emails from Mr. Kent, she explained that she did not trust Mr. Kent, that his communications only prompted her to continue her investigation, and that she built her case based on the disclosures made by the children.

Moreover, trial counsel testified at the post-conviction hearing that he reviewed the DCS case recording summary and the extensive DCS records prior to trial. His strategy was to show Ms. Dunn's investigation was "contaminated," and he filed five pretrial motions challenging Ms. Dunn's qualifications and competence. He stated that the trial court limited his attack on Ms. Dunn's forensic training. He believed that Mr. Kent's allegations "had little to do with the jury's consideration." Although he did not recall the specifics of his cross-examination of Ms. Dunn, he later testified that he used the case recording summary to cross-examine Ms. Dunn as well as both victims. The post-conviction court credited trial counsel's testimony and concluded that trial counsel made tactical decisions in his cross-examination of Ms. Dunn. We agree with the post-conviction court that trial counsel made reasonable strategic decisions, and we will not second-guess such decisions, especially where the Petitioner fails to allege in her brief which portions of the case recording summary should have been used on cross-examination. *See Felts*, 354 S.W.3d at 277. We conclude that the Petitioner has failed to show that the post-conviction court erred in denying relief on this ground.

## CONCLUSION

Based on the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE